IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF KANSAS

LORENZA C. MAREK,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )          Case No. 08-1036-WEB
                                     )
WAL-MART STORES, INC.,               )
                                     )
                Defendant.           )
_____)

MEMORANDUM AND ORDER

Before the court is the defendant's Motion for Summary Judgment (Doc. 64).  The

plaintiff's complaint alleges discrimination based on race and national origin, in violation of

Title VII, 42 U.S.C. § 2000e, and the Kansas Act Against Discrimination (KAAD), 44 K.S.A.

1001; discrimination based on retaliation, in violation of Title VII and the KAAD; and  race

discrimination in violation of 42 U.S.C. § 1981.  The plaintiff seeks back pay, front pay,

compensatory and punitive damages, and attorney's fees and costs.

The defendant argues the plaintiff cannot establish a prima facie case of retaliation, the

plaintiff has not shown an adverse employment action, Wal-Mart has produced legitimate,

nondiscriminatory and non-retaliatory reasons for termination, and the plaintiff cannot establish

pretext.

I.  Facts

For the purposes of defendant's motion for summary judgment, the following facts are

uncontroverted, deemed admitted, or, where disputed, viewed in the light most favorable to the

plaintiff.

    1.  Wal-Mart hired the plaintiff, Lorenza Marek, on November 3, 1998 to work as an

hourly cashier Associate.  (Pretrial Order, ECF Doc. 63, Stipulation ¶ 4.a.(1)).

2.  Plaintiff was promoted to an Assistant Manager in less than four years.  (Pretrial Order, ECF Doc. 63, Stipulation ¶ 4.a.(2)).

3.  Plaintiff worked in the El Dorado, Kansas store from January 24, 2004 until she was terminated on February 19, 2007.  (Pretrial Order, ECF Doc. 63, Stipulation ¶ 4.a.(5)).

4.  In May 2005, Paul Wilkins transferred to Store # 186 to work as the Store Manager. (Pretrial Order, ECF Doc. 63, Stipulation ¶ 4.a.(6)).

5.  From February 2001 to present, Pat O'Nelio has been the Market Manager (also referred to a District Manager) of the Market in which Store # 186 is located.  (O'Nelio Depo., pp. 3, 5, Plaintiff Exh. C).

6.  Wilkens did not have the authority to terminate Assistant Managers.  Only District Managers (Market Managers) have the authority to terminate Assistant Managers.  (O'Nelio Depo., p. 10-11, Plaintiff Exh. C; Wilkins Depo., p. 88, Plaintiff Exh. B).

7.  Wilkins completed the plaintiff's evaluation for the review period of February 2005 through January 2006.  The plaintiff received favorable evaluations and was described as "on target" and "very intelligent."  (Marek Depo., p. 231-232, Plaintiff Exh. A).

8.  In August 2005, plaintiff was selected to lead a training session for department managers. (Pretrial Order, ECF Doc. 63, Stipulations, ¶ 4.a.(7)).

9.  In January 2006, the plaintiff began to work on the overnight shift.  (Marek Depo., p. 25, Plaintiff Exh. A).

10.  As store manager, Wilkins generally worked from 7:00 a.m. to 5:00 p.m.  (Marek Depo., p. 88, Plaintiff Exh. A).

11.  After Marek began working the overnight shift, she did not see Wilkins on a day to day basis.  (Marek Depo., p. 259, Plaintiff Exh. A).

12.  It is the responsibility of the overnight Assistant Managers to supervise all overnight hourly Associates, regardless of what department the hourly Associate works in.  (Wilkins Depo., p. 25, Plaintiff Exh. B).

13.  The overnight Assistant Manager is a challenging position because its job duties entail running the entire store without the aid of individual department managers or upper management.  (Wilkins Depo., p. 29-30, Plaintiff Exh. B).

14.  During the plaintiff's orientation, she was provided with Wal-Mart's Employee Handbook and a representative of Wal-Mart reviewed it with her.  (Marek Depo., p. 181-82, Plaintiff Exh. A).

15.  Within Wal-Mart's Employee Handbook is its Discrimination and Harassment policy.  Wal-Mart's Discrimination and Harassment policy sets forth its requirement of equal employment opportunity.  (Declaration of Wilkins, Defendant Exh. C; Discrimination and Harassment Prevention Policy, Defendant Exh. C).

16.  According to Wal-Mart's written policy, Wal-Mart does not tolerate "any form of discrimination or harassment in any aspect of its business" and has a "zero tolerance" policy strictly prohibiting any discrimination or harassment by or directed at any associate.  (Declaring of Wilkins, Defendant Exh. C; Discrimination and Harassment Prevention Policy, Defendant Exh. C).

17. Wal-Mart's written policy, Discrimination and Harassment Prevention Policy, prohibits and broadly defines discrimination, harassment, and retaliation; sets forth reporting

procedures for Associates who believe discrimination, harassment, or retaliation has occurred; ensures that complaints will be investigated; and provides for corrective action up to and including termination when investigations reveal an Associate has engaged in discrimination, harassment, or retaliation. (Declaration of Wilkins, Defendant Exh. C; Discrimination and Harassment Prevention Policy, Defendant Exh. C).

18.  Because of her training as a new Associate at Wal-Mart, Marek knew that if inappropriate conduct is directed at her or anyone else, she had an affirmative obligation to report the conduct to a salaried member of management. (Marek Depo., p. 182, Plaintiff Exh. A).

19.  Marek also knew that all Associate reports of discrimination or harassment should be immediately forwarded to the District Manager. (Marek Depo., p. 180, Plaintiff Exh. A).

20.  The Assistant Manager's responsibility of scheduling Associates entails ensuring the accuracy of computer-generated schedules and modifying them as necessary to comport with Associates' availability and expectations. (Wilkins Depo., p. 51-52, Plaintiff Exh. B).

21.  In the El Dorado store, it was common practice that the overnight Assistant Manager scheduled to work on Thursday night keyed in the schedules for the overnight Associates. (Wilkins Depo., pp. 46-47, 142-43, Plaintiff Exh. B).

22.  From June through October 2006, including at the time of her Verbal Coaching, Marek was the Assistant Manager who was scheduled to work Thursday nights. (Marek Depo., pp. 47, 105, Plaintiff Exh. A).

23.  The plaintiff contends that in October 2006, she and Calvin Niblack, another Assistant Manager, shared the responsibility of scheduling Associates pursuant to an agreement

reached between the two of them.  (Marek Depo., p. 16, Plaintiff Exh. A).

24.  From June through October 2006, including at the time of Marek's Verbal Coaching, Niblack was not the Assistant Manager who was scheduled to work on Thursday night.  (Marek Depo, pp. 48, 105, Plaintiff Exh. A).

25.  Despite the plaintiff's and Niblack's informal and unofficial agreement, Wilkins does not know of a way to determine which Assistant Manager actually entered information into Wal-Mart's scheduling system.  (Wilkins Depo., p. 143-44, Plaintiff Exh. B).

26.  If an Associate reports to work but is not on the schedule to work, Wal-Mart's time clock will not allow the Associate to clock in.  To permit the Associate to clock in, an Assistant Manager must override Wal-Mart's scheduling system.  When this happens, the transaction will appear on a time clock exception report.  (Wilkins Depo, pp. 55-57, Plaintiff Exh. B).

27.  In October 2006, Wal-Mart was concerned with holding its Associates accountable for working exactly the times and shifts they were scheduled to work.  When Associates failed to work their scheduled times and shifts, they incurred attendance exceptions.  (Wilkins Depo., pp. 60, 71-72, Plaintiff Exh. B).

28.  In October 2006, a small  number of Associates informed Wilkins that they routinely do not work their scheduled times and shifts.  Instead, they were told by the plaintiff to work the shifts they generally worked.  Wilkins has been unable to identify any of the associates.  Wilkins did not check any of the exception reports to verify the information by the Associates.   (Wilkins Depo., pp. 61-62, Plaintiff Exh. B).

29.  Wilkins conferred with O'Nelio in relation to the October 2006 concern of the plaintiff instructing Associates to work unscheduled times and shifts.  O'Nelio instructed

Wilkins as follows:

> Pat [O'Nelio] suggested that I go ahead and document it on paper as a coaching for improvement just to let Lorenza [Marek] know that we have to make sure the schedules are correct and that if we see something like that pop up, that we need to go ahead and correct it and make sure the associates are working their correct schedule which [means both] correct in the system and what they're working.

(Wilkins Depo., p. 62, Plaintiff Exh. B).

30. On October 11, 2006, Wilkins gave Marek a Verbal Coaching for Improvement. (Marek Depo., p. 43-44, Plaintiff Exh. A; Wilkins Depo, pp. 59-64, Plaintiff Exh. B).

31. Coaching for Improvement involves a four-step process for monitoring and improving Associate performance. The policy is designed to be progressive. However, Management has discretion to employ any level of discipline, up to and including termination, depending upon the severity of the Associate's misconduct. (Declaration of Wilkins, Defendant Exh. C; Discrimination and Harassment Prevention Policy, Defendant Exh. C; Coaching for Improvement Policy, Defendant Exh. C).

32. The first level in the Coaching for Improvement process is a Verbal Coaching. Verbal Coachings notify an Associate or an Assistant Manager that his or her conduct requires improvement or correction. Verbal Coachings are always performed verbally and in a constructive, non-intimidating manner. Verbal Coaching of a Assistant Manager is a form of disciplinary action. (Declaration of Wilkins, Defendant Exh. C; Coaching for Improvement Policy, Defendant Exh. C;  O'Nelio Depo., p. 16, Plaintiff Exh. C).

33. The second level in the Coaching for Improvement process, a Written Coaching, is a more serious discussion and disciplinary action than a Verbal Coaching. (Declaration of Wilkins, Defendant Exh. C; Coaching for Improvement Policy, Defendant Exh. C).

34.    The third level in the Coaching for Improvement process, Decision-Making Day Coaching, the Associate is requested to develop a written Action Plan for improvement.  After performing the Written Coaching session associated with the Decision-Making Day Coaching, Wal-Mart provides the Associate one day off with pay to decide whether he or she will make the required improvement.    (Declaration of Wilkins, Defendant Exh. C; Coaching for Improvement Policy, Defendant Exh. C).

35.    The fourth level in the Coaching for Improvement process is termination. (Declaration of Wilkins, Defendant Exh. C; Coaching for Improvement Policy, Defendant Exh. C).

36.    The Coaching for Improvement process is used for Associates as well as for Assistant Managers.  (Coaching for Improvement Policy, Defendant Exh. C).

37.    Poor performance or misconduct within the one-year period following a Decision-Making Day Coaching leads to the fourth step of the policy, termination.  (Declaration of Wilkins, Defendant Exh. C; Coaching for Improvement Policy, Defendant Exh. C).

38.    The purpose of a Coaching for Improvement is "to notify an Associate that their conduct or performance does not meet Wal-Mart's stated expectations, and what they need to do to correct the situation."  (Coaching for Improvement Policy, Defendant Exh. C).

39.    Marek's October 11, 2006 Verbal Coaching stated as follows under "Impact of Associate's Behavior":

> The inconsistency of not keying in schedules and our associates not being able to know when they work has brought the morale down with our overnight associates.  It has caused some associates to be scheduled with only one day off in a two week period.  Not having the correct schedule posted, and being told to work their normal schedule has created some of our overtime.  Overtime is not an option, and will not be tolerated.

(Marek's Coaching for Improvement, Defendant Exh. D)

40. Marek admitted that her schedules were not keyed properly. (Wilkins Depo., p. 65, Plaintiff Exh. B).

41. Marek utilized Wal-Mart's Open Door Policy to protest her October 11, 2006 Verbal Coaching to Market Manager Pat O'Nelio, and did so on the same day it was issued. (Marek Depo., p. 14, Plaintiff Exh. A).

42. Wal-Mart's Open Door Communications Policy encourages open discussions between Associates and Management whenever an Associate wishes to bring "suggestions, observations, problems, or concerns" about his or her employment "to the attention of any supervisor or salaried member of management." (Declaration of Wilkins, Defendant Exh. D).

43. Market Human Resources Manager Jim Black was present during Marek's meeting with O'Nelio. (Black Depo., p. 155, Plaintiff Exh. D).

44. From June 17, 2006 through June 17, 2007, Black was the Market Human Resources Manager who oversaw human resource activities within the Market in which Wal-Mart Store # 186 was located. (Wilkins Depo., p. 89, Plaintiff Exh. B; Black Depo., p. 7, Plaintiff Exh. D).

45. During the Open Door meeting, Marek argued that the other Managers were doing the same thing she was doing, and she kept a better schedule than the rest of the Assistant Managers. (Marek Depo., p. 16, Plaintiff Exh. 1; O'Nelio Depo., p. 20, Plaintiff Exh. C; Black Depo., p. 156-59, Plaintiff Exh. D).

46. In response to Marek's Open Door communication regarding the Verbal Coaching, O'Nelio investigated several members of management and some hourly Associates. (O'Nelio Depo., p. 29, Plaintiff Exh. C).

47. Neither O'Nelio nor Black told Wilkins that Marek had utilized the Open Door policy to protest his October 11, 2006 Verbal Coaching of her. (Wilkins Depo., p. 68, Plaintiff Exh. B; O'Nelio Depo., p. 30, Plaintiff Exh. C; Black Depo., p. 159-60, Plaintiff Exh. D).

48. Wal-Mart Store # 186 in El Dorado has an electronic time clock which hourly Associates use to clock in and clock out. To utilize the time clock, hourly Associates swipe their badge. (Wilkins Depo., p. 16, Plaintiff Exh. B).

49. Wal-Mart generates a time clock exception report which reflects instances in which an hourly Associate has worked seven or more consecutive days without a day off (consecutive workday report). (Wilkins Depo., p. 47, Plaintiff Exh. B).

50. Around Christmas in 2006, Wal-Mart's regional compliance manager, during a routine inspection, told management at Store # 186 that Wal-Mart's Day of Rest policy needs to be more rigorously enforced and that management needed to give Associates at least one day off per week. (Wilkins Depo., pp. 90-93, 95, Plaintiff Exh. B).

51. In the few months prior to Marek's termination, Co-Manager Cindy Showalter cautioned her that Terry Johnson, an overnight Associate, was showing up on the consecutive workday report. (Marek Depo., p. 111-12, Plaintiff Exh. A).

52. At all times relevant to this lawsuit, Showalter was a Co-Manger at Store # 186 in El Dorado. (Showalter Depo., p. 4-5, Plaintiff Exh. H).

53. When an Associate appears on a time clock exception report, including the consecutive workday report, Wal-Mart management investigates by speaking with the Associate's supervisor in order to determine what happened. (Wilkins Depo., p. 22-23, Plaintiff Exh. B).

54. Marek alleges that at some time prior to her termination, Showalter told her to "make sure there are no associates appearing on the consecutive workday report." More specifically, Marek alleges that Showalter told her to make sure Terry Johnson does not show up on the consecutive workday report. (Marek Depo., pp. 61, 109, Plaintiff Exh. A).

55. On or about January 11, 2007, hourly Associate Terry Johnson reported to work at the beginning of his scheduled shift at 10:00 p.m. Johnson began working at 10:00 p.m. but Marek, in the capacity as Johnson's supervisor, instructed Johnson not to clock in. Instead, Marek altered Johnson's time records to show that Johnson reported to work at 12:02 a.m. to avoid Johnson showing up on the consecutive worked days report. Marek calculated the time needed to ensure Johnson was paid for his time and recorded an additional two hours at the end of Johnson's shift to show Johnson clocked out at 9:15 a.m. At Marek's direction, Johnson completed a time adjustment request to record an adjustment to his time records. (Pretrial Order Stipulations, ECF Doc. 63, Stipulations, ¶ 4.a.(9)).

56. On or about January 18, 2007, hourly Associate Terry Johnson reported to work at the beginning of his scheduled shift at 10:00 p.m. Johnson began working at 10:00 p.m. but Marek, in the capacity as Johnson's supervisor, again instructed Johnson not to clock in. Instead, Marek again altered Johnson's time record to show that Johnson reported to work at 12:03 a.m. to avoid Johnson showing up on the consecutive worked days report. Marek calculated the time needed to ensure Johnson was paid for his time and recorded an additional two hours at the end of Johnson's shift. (Pretrial Order Stipulations, ECF Doc. 63, Stipulations, ¶ 4.a.(10)).

57. Marek testified in the deposition that she manipulated Terry Johnson's hours.

(Marek Depo., p. 192, Plaintiff Exh. A).

58.  Marek admits that nobody instructed her to tell Johnson not to clock in when he arrived for work or to manipulate Johnson's time records to inaccurately reflect that Johnson began working after midnight, when in fact he had began working at 10:00 p.m. the prior day. (Marek Depo., p. 114, Plaintiff Exh. A).

59.  Marek altered Terry Johnson's hours to try to prevent Johnson from appearing on the consecutive days report.  (Marek Depo., p. 114, Plaintiff Exh. A).

60.  Because of Marek's action, Johnson performed work for Wal-Mart while he was not clocked in.  (Statement of Johnson, Defendant Exh. M).

61.  Because of Marek's action, Wal-Mart's time records inaccurately depicted the times that Johnson actually worked.  (Marek Depo., p. 121-22, Plaintiff Exh. A).

62.  Wal-Mart's Payroll Integrity policy (PD-29) contains the following provisions, among others:

> "Associates will be credited with all hours worked or other compensable time on the date the work was performed or the date for which the compensable time was requested and approved to be used.  An Associate who deliberately fails to record or instructs other not to record and/or make payment of compensable time during a pay period will be subject to disciplinary action up to and including termination"; and

> "Any Associate, hourly or salaried, who knowingly falsifies payroll records is subject to disciplinary action up to and including termination."

 (Payroll Integrity Policy, Defendant Exh. H).

63.  Wal-Mart's "Breaks, Meal Period, and Days of Rest" policy (PD-07) provides generally that "except in limited circumstances," "Associates should not be scheduled to work more than six (6) consecutive days."  (Breaks, Meal Periods, and Days of Rest Policy, Defendant Exh. I).

64. Black described the purpose of Wal-Mart's policies requiring accurate time records as follows: "..it's required by law. So that you can accurately pay somebody, so that you can accurately document things like work comp claims. There's a number of reasons why you keep accurate time records but largely just for that purpose, so that you have accurate records of when somebody worked, when they were there, when you were accountable for them. It can be as - as unlikely as something - if something happens in the store an you have to evacuate the store, you're going to want to know who's on the clock so you know who you need to account for and make sure they're there. So if the records aren't accurate, you can have issues." (Black Depo., p. 48, Plaintiff Exh. D).

65. Marek also completed a computer-based learning module which educates Associates about Wal-Mart's Payroll Integrity policy. It is titled "You Earned It." The "You Earned It" module instructed Marek, in relevant part, as follows: (1) "No hourly Associate should ever perform work for the Company while off the clock"; (2) "All hourly Associates are required to clock in when starting work"; (3) "The hours that an Associate works can not be moved"; and (4) "The Company must maintain accurate payroll records." (Training - You Earned It, Defendant Exh. J; Marek Depo., pp. 179, 190, Plaintiff Exh. A; Payroll Integrity Policy, Defendant Exh. H).

66. Because of training Wal-Mart has provided to her, Marek was aware in January 2007 that Associates were not allowed to work off the clock. (Marek Depo., p. 137, Plaintiff Exh. A).

67. Marek also knew that all Associates were required to clock in when starting work. (Marek Depo., p. 192, Plaintiff Exh. A).

68. Marek was aware in January 2007 that integrity is an important component of Wal-

Mart's "Three Basic Beliefs." (Marek Depo, p. 152, Plaintiff Exh. A).

69. Shortly after Marek altered Johnson's time records on January 18, 2007, an Associate in Store # 186's personnel department informed Wilkins that Marek had made an adjustment to Johnson's payroll records in which "time keyed in was changed from what the Associate actually worked." (Wilkins Depo, pp. 100, 138, Plaintiff Exh. B).

70. After learning about the altered time records, Wilkins reported Marek's alteration of Johnson's time records to Black. (Black Depo., p. 11-12, Plaintiff Exh. D).

71. Black investigated Marek's action relating to Johnson's time records of January 11 and 18, 2007. (Pretrial Order, ECF Doc. 63, Stipulations, ¶ 4.a.(11).

72. During the course of his investigation, Black interviewed seven different witnesses and examined a number of documents. (Black Depo., p. 34-35, Plaintiff Exh. D).

73. In conjunction with his investigation, Black also audited the time records of every Tire & Lube Associates for a nine week period and found no integrity issues similar to those raised by Marek's conduct. (Investigative Report, Defendant Exh. L).

74. Black obtained written statements from Marek and Johnson to assist him in his investigation. (Black Depo., p. 18-19, Plaintiff Exh. D).

75. Marek states as follows in her written statement:

> Teri Johnson has Tuesday and Wednesday nights off. On Tuesday January the 9th, 2007, I asked him if he would work on his night off because we had a snow storm the previous weekend and our grocery and dairy trucks were running behind. That Tuesday night they finally did catch up and we got four grocery trucks to be worked. I had two grocery associates, nobody to work dairy, no grocery support manager, plus our shelves were empty. Terri worked Tuesday, left Wednesday morning, he had Wednesday night off and came back on Thursday night at 10:02. I told him that I would clock him in.
> I clocked him in at 12:02 (I moved the time 2 hours later, and added one hour at the end of his shift and the other hour at the end of the previous night

shift, all within the same week, so he would not show up on the consecutive worked days report) I figure it would be ok since this is a practice I have seen since I became an assistant manager. I paid Teri exactly the hours he worked, did not move anything from one week to another. Plus I had been told to make sure not to have anyone showing up on that consecutive worked days report.

The following week I had the same situation on Thursday January 18th, we had another snow storm and did the same.

(Marek Statement, Defendant Exh. N).

76. The written statement which Black obtained from Johnson stated as follows:

I am off on Tuesdays and Wednesdays. I was asked by Lorenza [Marek] to work two Tuesdays in a row. When I came in on Thursday she told me to go ahead and work, but not clock in until 12:00 midnight, and she would fill out a time adjustment. That was January 11th, and the 18th.

(Johnson Statement, Defendant Exh. M).

77. In response to Marek's claim that there was "a practice" of manipulating time records, Black reviewed a period of time records relating to Associates working at Store # 186, identified nine suspicious-looking time adjustments, and inquired into them. The adjustments Black considered suspicious were those "where there was a time in there and then something else was put in over it or there was an entire shift that was put in where they didn't clock in or out and somebody put them in. Those were the kind of things that might have been suspect to me." (Black Depo., pp. 70-71, Plaintiff Exh. D).

78. Black interviewed the Associate and the Assistant Manager involved in the nine suspicious time entries and determined each situation "wasn't similar to what happened in Ms. Marek's case...if they could articulate to me a reason why they had to make these adjustments that didn't violate any policies." (Black Depo., p. 72, Plaintiff Exh. D).

79. Sometimes, an Assistant Manager will enter a "placeholder punch" on an Associates's time record. A placeholder punch is the manner in which an Assistant Manager,

14

after realizing that there may be an error in an Associate's time record, makes a note to his or herself to "go back and get the actual time [the Associate worked] and correct it." (Black Depo., p. 72, Plaintiff Exh. D).

80. Black does not attribute any malfeasance or dishonesty to a placeholder punch because such a punch constitutes an acknowledgment by the Assistant Manager that he or she is "missing something" and "needs to correct it" at his or her first opportunity. (Black Depo, p. 80-81, Plaintiff Exh. D).

81. Black prepared a summary of his investigation and recommendations, dated February 13, 2007, and provided it to Market Manager Pat O'Nelio. (Pretrial Order, ECF Doc. 63, Stipulations, ¶ 4.a.(12).

82. Black concluded that Marek altered Johnson's time records "to avoid appearing on a report for a violation of policy." Black concluded, "Her intent was to falsify the records to avoid detection." (Black Depo., p. 24, Plaintiff Exh. D; Investigation Report, Defendant Exh. L).

83. Black concluded that "She [Marek] then adjusted his time from the previous day worked by one hour and his departure time from that day by one hour to get him to the correct total number of hours, and reduce the suspicion that might be raised by a late departure had she simply added the time to the end of his shift. She also signed a false time adjustment slip supporting the entries in the system. In short, she elected to enter as many as six false entries in a two week period to avoid accountability for the days of rest violation." (Black Depo., p. 34-36, Plaintiff Exh. D; Investigation Report, Defendant Exh. L).

84. In his deposition, Black explained his conclusion regarding Marek's intent in altering time records was based in part upon "common sense":

Part of my job in doing investigations is to apply common sense and to apply my experience. When somebody goes in and makes adjustments to a time record to inaccurately record time, it's kind of a conclusion that can easily be drawn that they believe there's something they're going to get in trouble for there. She spoke to the fact she moved time so it wouldn't be that day so I drew the conclusion that she was trying to avoid what she perceived to be - that she would show up on the report or there would be a days-of-rest violation.

(Black Depo., p. 51-52, Plaintiff Exh. D).

85. After completing his investigation, Black consulted Melody Fogarty, his interim supervisor, in order to get a second opinion before recommending Marek's termination to O'Nelio. (Black Depo., p. 67-69, Plaintiff Exh. D).

86. Wal-Mart's Payroll Integrity policy (PD-29) also contains the following provisions relevant to terminating Assistant Manager who falsify time records:

"Allegations of payroll manipulation will be throughly investigated. If it is determined that compensable benefit time or hours were intentionally altered, in any manner, the responsible Associate(s) will be terminated."

"Any salaried member of management who is knowledgeable of and fails to correct it appropriately or directs inappropriate payroll manipulation will be terminated."

"Inappropriate payroll manipulation will be considered Gross Misconduct and will be grounds for immediate termination. An Associate (hourly or salaried) terminated for this reason will not be eligible for rehire."

(Payroll Integrity Policy, Defendant Exh. H).

87. Wal-Mart's Coaching for Improvement policy provides as follows in relation to Gross Misconduct:

Gross misconduct will not be tolerated. Coaching for Improvement will not be used to address gross misconduct. The employment of an Associate who is deemed to have engaged in gross misconduct is subject to immediate termination. Associates terminated for gross misconduct are not eligible for re-hire.

(Coaching for Improvement Policy, Defendant Exh. C).

88. Wal-Mart's Coaching for Improvement policy lists "falsification of Company records" as an example of Gross Misconduct. (Coaching for Improvement Policy, Defendant Exh. C).

89. Marek does not dispute that Gross Misconduct will result in termination rather than progressive discipline under Wal-Mart's policies. (Marek Depo., p. 44, Plaintiff Exh. A).

90. Based upon his investigation and findings, Black recommended Marek's termination to O'Nelio. (Black Depo., p. 56, Plaintiff Exh. D; Investigation Report, Defendant Exh. L).

91. O'Nelio terminated Marek's employment on February 19, 2007. The termination paperwork states the reason is for Gross Misconduct - Integrity because she "falsified time records to avoid a day of rest violation." (Pretrial Order, ECF Doc. 63, Stipulations, ¶4.a.(13)).

92. Wilkins was not a part of the decision to terminate Marek. (O'Nelio Depo., p. 10, 88, Plaintiff Exh. C).

93. Prior to terminating Marek, O'Nelio conferred with his supervisor, Kelvin Lynch, to ensure that he agreed termination was the correct decision. (O'Nelio Depo., p. 59, Plaintiff Exh. C).

94. Marek did not use the Open Door policy to protest her termination. (Marek Depo., p. 42, Plaintiff Exh. A).

95. Marek's January 2007 evaluation was never presented to her because she was terminated before it could be. (Wilkins Depo., p. 168, Plaintiff Exh. B).

96. Four months after Marek's termination, Lorna Cherry replaced Marek. Marek's position was initially filled by a white male, but then permanently filled by Ms. Cherry. Cherry is Filipino and speaks with an accent. (Wilkins Depo., p. 10-11, Plaintiff Exh. B; Showalter

Depo., p. 50-53, Plaintiff Exh. H).

II.  <u>Jurisdiction</u>

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343, 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f) and 42 U.S.C. § 1981.

III.  <u>Standard of Review</u>

Summary judgment is appropriate when "the pleading, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  <u>Wright v. Abbott Labs., Inc.</u>, 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  <u>Faustin v. City & County of Denver</u>, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  <u>Allen v. Muskogee</u>, 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party.  <u>Id</u>.

The moving party bears the burden of showing the absence of any genuine issue of material fact.  <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The moving party may satisfy its burden by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670 (10th Cir. 1998).  Once the moving party has met its burden, to

avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991).

On a Title VII case involving circumstantial evidence, the Supreme Court has directed courts to apply a three-step burden shifting analysis to determine whether summary judgment is appropriate. See <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792, 93 St.C. 1817, 36 L.Ed.2d 668 (1973). Under McDonnell-Douglas, the plaintiff has the initial burden to present a prima facie case of retaliation or discriminatory treatment. See <u>id</u>. If a plaintiff can make out a prima facie case, the burden shifts to the employer to show a legitimate business reason for its action. <u>Id</u>. at 806. If the employer can offer such a reason, the burden shifts back to the plaintiff to present evidence from which a reasonable fact finder could conclude that the employer's offered reason is pretextual. <u>Paup v. Gear Products, Inc.</u>, 327 Fed.Appx. 100, 108 (10th Cir. 2009). A plaintiff may show pretextual motive by producing evidence which demonstrates that the employer's proffered reason for acting adversely is "unworthy of belief". <u>Adamson v. Multi Cmt. Diversitfied Servs. Inc.</u>, 514 F.3d 1136, 1146 (10th Cir. 2008). The employee retains the burden of proving that his employer intentionally retaliated or discriminated against him. <u>Id</u> at 1145.

IV. <u>Discussion</u>

a. Discrimination based on race and national origin pursuant to Title VII and KAAD; Discrimination based on Section 1981

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under the Kansas Act Against Discrimination, an employer cannot "discharge, expel or otherwise discriminate against any person because he has opposed any practices or acts forbidden under this act or because he has filed a complaint, testified or assisted in any proceeding under this act. K.S.A. § 44-1009(a)(4). Claims pursuant to KAAD are reviewed under the same analysis of Title VII. Aramburu v. Boeing Co., 112 F.3d 1398, 1403 n. 3 (10th Cir. 1997).

The plaintiff also alleges discriminatory termination based on race pursuant to 42 U.S.C. § 1981. "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). Discrimination based on race pursuant to 42 U.S.C. § 1981 is examined under the same elements as Title VII. Carney v. City and County of Denver, 534 F.3d 1269, 1273 (10th Cir. 2008).

The plaintiff has not set forth direct evidence of discrimination. Therefore the court looks to the McDonnell Douglas framework. The burden is on the plaintiff to establish a prima facie case of race discrimination, which she may do by showing (1) that she is a member of a protected class, (2) that she was subject to an adverse employment action, and (3) that the adverse employment action occurred under circumstances which give rise to an inference of discrimination. Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 117, 1181 (10th Cir. 2002).

The plaintiff is Hispanic, and therefore a member of a protected class.  An adverse

employment action is "a significant change in employment status, such as hiring, firing, failing

to promote, reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits."  Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007).  The

plaintiff argues that termination was the adverse employment action, however, the coaching was

also an adverse employment action.  The court will address both arguments.

Market Manager Pat O'Nelio testified at his deposition as follows, "It's serious for a

coaching of any matter because a coaching can stop or prohibit a member of the management to

be promoted, so it's very serious.  Termination is the serious thing, but coaching is serious too."

(Black Depo., p. 17, Plaintiff Exh. C).   The Tenth Circuit has ruled that "a written warning may

be an adverse employment action only if it effects a significant change in the plaintiff's

employment status."  Hynes v. Level 3 Communications, LLC, 456 F.3d 1215, 1224 (10th Cir.

2006).  The record shows that Wal-Mart's discipline was designed to be progressive, although

management was given discretion.  In Haynes, the court found that a written reprimand did not

change her pay, she was not demoted, and her responsibilities were not significantly modified.

Id.  The coaching for the plaintiff is similar to the written warning issued to the plaintiff in

Haynes.  The plaintiff attempts to compare this case with the written reprimands received by the

plaintiff in Roberts v. Roadway Exp., Inc.  149 F.3d 1098 (10th Cir. 1998).  In Roberts, the court

found the plaintiff received twenty warning letters in a two year period.  Id. at 1104.  The court

found that the record showed the more warnings an employee received, the more likely he or she

was to be terminated for a further infraction.  Therefore, the twenty warning letters constituted

an adverse action.  Id.  This is not similar to the case at hand, where the plaintiff received only

one verbal coaching in her twelve years at Wal-Mart. The plaintiff has not shown the coaching effected a significant change in her employment status, therefore the court finds the coaching was not an adverse employment action. However, termination is a detrimental change in the terms or conditions of employment, and is an adverse employment action. Vaughn v. Epworth Villa, 537 F.3d 1147, 1150 (10th Cir. 2008).

The plaintiff must show at least a logical connection between each element of the prima facie case and the inference of discrimination. Kendrick v. Penske Transp. Serv., Inc., 220 F.3d 1220, 1227 (10th Cir. 2000). In this case, the plaintiff has shown she is qualified for the job, as she worked at Wal-Mart for over twelve years, moved up to an Assistant Manager, and had a Bachelors degree in Marketing from the Institute of Technology and Higher Studies of the West. Her position was not eliminated, and her position was temporarily filled by a white male until it was permanently filled by Ms. Cherry four months later.

On October 11, 2006, Marek received a Coaching for Improvement by Paul Wilkins. She discussed the coaching with the store manager, Pat O'Nelio. Marek states that she told O'Nelio and Black that she thought Wilkens' behavior was discriminatory. (Marek Depo., p. 14-22, Plaintiff Exh. A). However, neither Black nor O'Nelio remembered Marek complaining about discrimination or being treated differently based on her race, accent, or country of origin. (O'Nelio Depo., p. 33-35, Plaintiff Exh. C; Black Depo, p. 156-57, Plaintiff Exh. D). However, at the summary judgment stage, the court will construe the facts in the light most favorable to the nonmoving party, and will assume the plaintiff did complaint to Black and O'Nelio of Wilkens' allegedly discriminatory conduct. The plaintiff's qualifications, her work history, and the coaching in October, together with the allegation of discrimination in October, establishes the

connection of the prima facie case elements and the inference of discrimination.    The plaintiff

has met her burden to establish a prima facie case of discrimination.

Wal-Mart argues that it has set forth legitimate, nondiscriminatory, and non-retaliatory

reasons for the plaintiff's termination.  Wal-Mart states the plaintiff was terminated for violating

company policy by falsifying company records, which constitutes gross misconduct, and a

terminable offense.  Wal-Mart's Payroll Integrity policy states as follows: "Any Associate,

hourly or salaried, who knowingly falsifies payroll records is subject to disciplinary action up to

and including termination."  (Payroll Integrity Policy, Plaintiff Exh. P).  The Policy also states

under "Payroll Manipulation", "Allegations of payroll manipulation will be thoroughly

investigated.  If it is determined that compensable benefit time or hours worked were

intentionally altered, in any manner, the responsible Associate(s) will be terminated."  (Payroll

Integrity Policy, Plaintiff Exh. P).  The next section under "Falsification of Payroll Records"

states, "Any Associate who deliberately falsifies his/her own or another's payroll record will be

terminated."  (Payroll Integrity Policy, Plaintiff Exh. P).  The Policy also states, " Inappropriate

payroll manipulation will be considered Gross Misconduct and will be grounds for immediate

termination."  (Payroll Integrity Policy, Plaintiff Exh. P).  Marek does not dispute that she

altered the time record of an Associate.  Wal-Mart has set forth a legitimate, nondiscriminatory

reason for termination.

The burden shifts to the plaintiff to show Wal-Mart's stated reason for termination is

pretext.  A plaintiff establishes pretext by showing "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a legitimate fact finder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons." <u>Danville v. Reg'l Lab Corp.</u>, 292 F.3d 1246, 1250 (10th Cir. 2002). Typically, a plaintiff attempts to show pretext in one or more of three ways. <u>Kendrick v. Penske Transp. Servs.</u>, 220 F.3d 1220, 1230 (10th Cir. 2000). First, with evidence that the defendant's stated reason for the adverse employment action was false. <u>Id.</u> Second, with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances. <u>Id.</u> Or third, with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. <u>Id.</u> Plaintiff attempts to show pretext by arguing Wal-Mart's reason for termination was inconsistent. The plaintiff argues that Wilkins and Wal-Mart stated numerous times that Marek scheduled an associate in violation of the days of rest policy, but in actuality, the associate was not scheduled in violation of this policy. Plaintiff also argues Wal-Mart falsely stated that Marek had changed records for the purpose of hiding her violation of that policy, which she claims is false because there was no violation of the policy.

Paul Wilkins testified at the deposition as follows: "...that's why she made that decision, to avoid that [days-of-rest violation]. Whether it was or not, that's the reasoning she made the decision to ask him not to clock in but to perform work. We didn't even get that far to whether it was or not, but that's why she did it, to avoid that. Whether it was or not is not necessarily the issue." Depo., p. 122-23, Plaintiff Exh. B). "However, hypothetically, if you're instructing someone to work off the clock, no matter whatever reason it is, to perform work without being paid for that work, you're wrong, so - so I don't know how many different - whether it's to avoid something down the road, or whatever, but you're - if you're questioning the integrity to hide

something, then that's an issue." (Wilkins Depo., p. 127, Plaintiff Exh. B). "Meal exceptions occurred, but that's not something to be terminated over; that's something to try and fix and move on. But integrity is gross misconduct." (Wilkins Depo., p. 128, Plaintiff Exh. B). "I don't really understand the question, but if you're asking if we discussed that she would have been in trouble over this seven days, we really weren't concerned with that at that moment; we were concerned with the, having the associate work off the clock." (Wilkins Depo., p. 128, Plaintiff Exh. B).

Pat O'Nelio testified that "The reason for termination was ethics. The reason for termination was integrity." (O'Nelio Depo., p. 50, Plaintiff Exh. C). O'Nelio had the following conversation with plaintiff's counsel:

> A: "Lorenza was terminated for falsifying time records.
> Q: She made entries that she knew was not accrued, correct?
> A: Correct.
> Q: And turned them in?
> A: Correct.
> Q And is that all you needed to know?
> A: Yeah.
> Q: Didn't matter why?
> A: No.
> Q: Didn't matter -
> A: No
> Q: Didn't matter -
> A: Intent, judgment had nothing to do with it.
> Q: Okay.
> A: Integrity did.  C, p. 55).

(O'Nelio Depo, p. 55, Plaintiff Exh. C). O'Nelio further testified, "...the most important thing was the falsifying the documents, falsifying payroll records. There is no reason why the addition of the violation of the days-of-rest policy show up on all of them at all, to my knowledge." (O'Nelio Depo., p. 81-82, Plaintiff Exh. C). O'Nelio also testified that "Anytime you falsify a

payroll record to an associate is serious as anything of gross misconduct, and that involves integrity, which involves termination." (O'Nelio Depo., p. 82, Plaintiff Exh. C).

Black testified that he concluded "A: That she was attempting to avoid appearing on a report for a violation of policy. Her intent was to falsify the records to avoid detection. Q: Was it to avoid a policy violation? A: What she perceived to be a policy violation. I don't know that there would have been or not." (Black Depo., p. 24, Plaintiff Exh. D). Black further testified, "In my opinion, no, just the fact that someone would falsify a record, whether it's to avoid being on a report. As managers, we're required to behave ethically, and if there's a falsification of a record, in my mind, it doesn't matter if it's to avoid detection on a report or to avoid an actual violation, it's still a falsification of a record. And just to - just to be clear, Counsel, that's why she was separated; it wasn't for violating PD-07, it wasn't for the days-of-rest issue, it was for the fact that she falsified records." (Black Depo., p. 25, Plaintiff Exh. D).

The Exit Interview statement of termination states, "Associate falsified time records to avoid a day of rest violation with an hourly associate." The section for Gross Misconduct - Integrity Issue is marked. (Exit Interview, Plaintiff Exh. F). In the answer to plaintiff's interrogatory, Wal-Mart stated "Mr. O'Nelio terminated Plaintiff's employment for 'Gross Misconduct - Integrity Issue' because Plaintiff 'falsified time records to avoid a day of rest violation with an hourly associate." (Answer to Interrogatories, p. 5, Plaintiff Exh. G). In another answer, Wal-Mart states, "it terminated Plaintiff's employment because she intentionally falsified company time records for Associate, Terry Johnson, to avoid a day of rest violation. Plaintiff's falsification of company records constituted Gross Misconduct as that term is defined by Wal-Mart's Coaching for Improvement policy and mandated her immediate termination."

(Answer to Interrogatories, p. 7, Plaintiff Exh. G). The response to the Kansas Department of Labor stated "The claimant was discharged due to violation of company policy. She had an employee come in for a seventh consecutive day, which violated the employer's policy concerning providing days of rest for employees. The claimant then proceeded to alter time records in order to give the appearance that the employee had worked only 6 consecutive days, had a day off, and then worked again on the 8th day. She had previously been disciplined due to failing to write a schedule for employees in her department. The claimant protested the decision to terminate her employment under the employer's open door policy, and a thorough investigation was conducted into all of her allegations. The decision was upheld after it was verified that she was not following "standard practices" in the store." (Employer Notice, Plaintiff Exh. L). In the letter to the U.S. Equal Employment Opportunity Commission, the defendant stated, "Wal-Mart terminated Ms. Marek's employment because she falsified Company records - an act she does not deny." (Letter EEOC, p. 1, Plaintiff Exh. M). The letter also states "Mr. Black's investigation confirmed that Ms. Marek intentionally and admittedly falsified Company time records on two separate occasions and did not understand the seriousness of her actions. Ms. Marek's conduct constituted 'Gross Misconduct' under Wal-Mart's Coaching for Improvement Policy, mandating her immediate termination. Wal-Mart terminated Ms. Marek's employment for her admitted act of Gross Misconduct." (Letter EEOC, p. 5, Plaintiff Exh. M). In the second letter to the EEOC, dated October 19, 2007, Wal-Mart answered the following question: "Why was Ms. Marek discharged?"

> "Wal-Mart terminated Ms. Marek's employment because she engaged in
> unethical and dishonest conduct in violation of Wal-Mart's Statement of Ethics
> and Pay Administration Guidelines and intentionally falsified Company records to
> conceal her unethical conduct. Ms. Marek's conduct constituted Gross

Misconduct under Wal-Mart's Coaching for Improvement Policy warranting her immediate termination. Specifically, Ms. Marek instructed an overnight Associate to work on his day off, which resulted in the Associate having hours worked on seven consecutive days. Wal-Mart policy explicitly prohibits Associates from working on seven consecutive days. Rather than dealing with the situation and explaining why she needed the Associate to work on his day off and seeking advanced approval to deviate from policy, Ms. Marek instructed the Associate to not clock in when he arrived for work. She then entered false time punches for the Associate, which made it appear that he worked no hours on one of the days he worked. Ms. Marek's action resulted in the Associate working off the clock, which Wal-Mart's policies expressly prohibit. Moreover, her actions to conceal the policy violations were deceptive and dishonest. Wal-Mart does not tolerate unethical or dishonest behavior, regardless of an Associate's title. Wal-Mart, therefore, terminated Ms. Marek's employment for her Gross Misconduct." (Second Letter EEOC, p. 4-5, Plaintiff Exh. N).

The evidence before the court cannot reasonably support the plaintiff's argument that Wal-Mart's reason for termination was inconsistent. Wal-Mart and Wal-Mart managers repeated numerous times that the plaintiff was terminated for falsifying time records. The plaintiff has failed to produce evidence showing that defendant's stated reason for termination was false or pretext. "Mere conjecture that defendant's explanation is pretext for intentional discrimination is an insufficient basis for denial of summary judgment." Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988). The defendant has shown a legitimate, nondiscriminatory reason for terminating plaintiff, and there is no reasonable inference raised by the evidence showing defendant's reason to be pretextual. The court grants the defendant's motion for summary judgment on plaintiff's discrimination based on race and national origin claim, and discriminatory termination in violation of 42 U.S.C. § 1981.

b. Discrimination based on retaliation

Title VII makes it unlawful for an employer "to retaliate against an employee when that employee takes action in opposition to a discriminatory practice." 42 U.S.C. § 2000e-3(a). To

prove a claim for retaliation, a plaintiff must show circumstantial evidence or present direct evidence of discrimination. Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1136 (10th Cir. 2000). Direct evidence demonstrates on its face that the employment action was discriminatory. Ramsey v. City & County of Denver, 907 F.2d 1004, 1008 (10th Cir. 1990). A plaintiff may prove discrimination through direct evidence by establishing proof of "an existing policy which itself constitutes discrimination." Id., citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Circumstantial evidence permits the fact finder to draw a reasonable inference from facts indirectly related to discrimination to show that discrimination, in fact, has occurred. Stone, 210 F.3d at 1136.

When there is no direct evidence, the court engages in the three step burden shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff bears the initial burden of establishing a prima facie case of retaliation. Vaughn v. Epworth Villa, 537 F.3d 1147, 1150 (10th Cir. 2008). To establish a prima facie case of retaliation, the plaintiff must demonstrate (1) that she engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection between the protected activity and the materially adverse action. Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006). Once the employee establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001). If such a reason is articulated, the employee must then demonstrate that the employer's proffered reason for the adverse action is pretextual. Id.

To establish adverse employment action, plaintiff must experience " a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). An action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. V. White, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

The plaintiff has not presented direct evidence to support her claim of retaliation. Therefore, the court engages in the three step burden shifting framework. In the first step, the plaintiff must show that she engaged in protected opposition to discrimination. It is clear from the Complaint that the plaintiff's protected opposition to discrimination was her complaint to O'Nelio and Black of Wilkins coaching. The plaintiff argues she complained to Pat O'Nelio and Jim Black that Paul Wilkins' coaching of her was discriminatory. Although O'Nelio and Black do not recall plaintiff alleging discriminatory treatment, the evidence at this stage is viewed in the light most favorable to the plaintiff. The plaintiff has satisfied the first step. The court has already determined the plaintiff's termination was an adverse employment action. The plaintiff has satisfied the second step. The defendant argues that the plaintiff cannot establish a causal connection between the protected activity and the materially adverse action. The defendant also argues that summary judgment is appropriate, because it has produced a legitimate, nondiscriminatory, and non-retaliatory reason for terminating Marek in February 2007, and that plaintiff cannot establish pretext.

This court need not determine if the plaintiff has established a causal connection between

the protected activity and the adverse action.  Even assuming the plaintiff can establish a causal connection, the court previously found the defendant has shown a legitimate, nondiscriminatory, and non-retaliatory reason for terminating Marek, and there is no reasonable inference raised by the evidence showing defendant's reason to be pretextual.  The court grants the defendant's motion for summary judgment on plaintiff's discrimination based on retaliation claim.

V.  Conclusion

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Doc. 64) be GRANTED  in accordance with the above rulings.

IT IS ORDERED that the plaintiff Lorenza Marek recover nothing, the action be dismissed on the merits, and the defendant Wal-Mart recover its costs of action from the plaintiff.

SO ORDERED this 21st day of January, 2010.

  s/ Wesley E. Brown                                   
Wesley E. Brown, U.S. Senior District Judge